# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

|  |  |  |
|---|---|---|
| **TAMARA L. COCHRAN-MAY,** individually and on behalf of herself and all others similarly situated, | ) ) ) ) | **CIVIL ACTION NO.:** **JURY TRIAL DEMANDED** |
| **Plaintiff** | ) ) ) |  |
| **v.** | ) ) |  |
| **WELLS FARGO BANK, N.A., WELLS FARGO HOME MORTGAGE, INC., ASSURANT, INC., AMERICAN SECURITY INSURANCE COMPANY and VOYAGER INDEMNITY INSURANCE COMPANY** | ) ) ) ) ) ) ) |  |
| **Defendants** | ) ) |  |

## CLASS ACTION COMPLAINT

1.      Plaintiff Tamara L. Cochran-May, ("Plaintiff") on behalf of herself and all other similarly situated homeowners who have or had residential mortgage loans and/or lines of credit originated and/or serviced by defendants Wells Fargo Bank, N.A., Wells Fargo Bank, N.A. #591, or Wells Fargo Home Mortgage between July 12, 2008 and the present (the "Class Period") and, in connection therewith, were required to pay for "force-placed" wind insurance policies.

2.      In the event that borrowers fail to maintain their wind insurance policies, rather than attempt to maintain delinquent borrowers' existing policies, Defendants commonly choose to replace borrowers' insurance policies with more expensive ones, known as "force-placed" insurance policies. Such policies provide less coverage and are substantially more costly than the borrowers' original policies, while providing lucrative financial benefits to servicers and/or their affiliates. Further, such policies often provide unnecessary or duplicative coverage, in that they

are improperly backdated to collect premiums for time periods during which there is absolutely no risk of loss.

    3.      As the *American Banker* recently observed:

> When banks buy insurance on the homes of borrowers whose policies have lapsed, they get a great deal. Just not for the homeowners and investors who have to pay for it.

> Nominally purchased to protect the owners of mortgage-backed securities, such "force-placed" insurance can be 10 times as costly as regular policies, raising struggling homeowners' debt loads, pushing them toward foreclosure — and worsening the loss to investors on each defaulted loan.

> Evidence of abuses and self-dealing in the force-placed insurance industry suggests that there may be far larger problems in how servicers are handling distressed loans than the sloppy document recording that has been the recent focus of industry woes.

> Behind banks' servicing insurance practices lie conflicts of interest that align servicers and their insurer partners against borrowers and investors. Bank of America Corp. owns a force-placed insurance subsidiary, and most other major servicers receive commissions or reinsurance fees on the very same policies they purchase on investors' and borrowers' behalf.

*See* Jeff Horwitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, American Banker (Nov. 9, 2010)(hereinafter "Ties to Insurers"), available at: http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html?zkPrintable=1&nopagination=1 (referred to herein as "Ties to Insurers").

    4.      In this action, Plaintiff challenges, among other things and as further described herein, Defendants' decision to purchase force-placed wind insurance from insurers that provide a financial benefit to Defendants and/or their affiliates, in the form of kickbacks, commissions, "rebates" and other consideration, and at rates that far exceed borrower-purchased wind insurance.

5.      Throughout the Class Period, Defendants have engaged in unlawful, abusive and unfair practices with respect to force-placed insurance, including, among others and as described in further detail below: (a) providing force-placed insurance according to pre-arranged agreements at a substantial and inappropriately high cost to the borrower; (b) receiving kickbacks in the form of purported fees, payments, commissions, "rebates" and/or other things of value from providers of force-placed insurance; (c) providing force-placed insurance from their own affiliates at a substantial, improperly high cost to the borrower; (d) forcing borrowers to pay for unnecessary insurance; and (e) improperly exploiting their ability to manage and gain access to escrow funds in breach of fiduciary obligations to increase profits to themselves.

6.      Defendants Wells Fargo Bank, N.A. ("WFBNA") and Wells Fargo Home Mortgage, Inc.'s ("WFHM")(together "Wells Fargo"), unlawful actions include, *inter alia,* purchasing unconscionably high-priced insurance policies, having pre-arranged agreements to purchase force-placed insurance from a single company in which they have a financial interest, backdating the force-placed policies to charge for retroactive coverage, and giving and receiving "commissions" or "kickbacks" for the procurement of the force-placed policies. These actions constitute a pattern of exploitative profiteering and self-dealing against the interest of Plaintiff and the absent Class members.

7.      Defendants', Assurant Inc., American Security Insurance Company ("ASIC") and Voyager Indemnity Insurance Company ("Voyager") (together "Assurant"),[1]  unlawful actions also include, *inter alia*, aiding and abetting Wells Fargo's breach of fiduciary duty through the promotion and participation in a scheme pursuant to which Assurant sold unconscionably high-priced, unnecessary, and duplicative force-placed insurance coverage and related services, including tracking, pursuant to pre-arranged agreements facilitated through the

---

[1]      The term "Defendants" refers to Wells Fargo and Assurant, collectively.

improper utilization of access to escrow funds in order to maximize Defendants' profits to the detriment of borrowers.

8.      Upon information and belief, Wells Fargo has entered into agreements with Defendants ASIC, Assurant, Inc., Voyager  and/or other affiliates and subsidiaries of Assurant, Inc., pursuant to which Wells Fargo, and/or its subsidiaries/affiliates: (a) receive a portion of the premiums for each force-placed insurance policy purchased for a borrower; and/or (b) assume a portion of the force-placed insurance policies originally written by force-placed insurance providers without any real or commensurate transfer of risk.  Moreover, upon information and belief, those arrangements are exclusive.  *See* Assurant Form 10-K for the year ending December 31, 2011, filed on February 23, 2012, at 4 ("Assurant Specialty Property establishes long-term relationships with leading mortgage lenders and servicers.  The majority of our lender-placed agreements are exclusive.  Typically these agreements have terms of three to five years and allow us to integrate our systems with those of our clients.").

9.      While Plaintiffs are not challenging Defendants' *ability* to force-place insurance policies and to charge fees/premiums for the same, Plaintiffs do challenge the *manner* in which Defendants manipulated the force-placed insurance process for Defendants' own financial gain.

10.      At issue in this case, is whether Defendants engaged in unfair, deceptive and/or fraudulent business practices, whether Defendants manipulated the force-placed insurance process so as to obtain kickbacks, and whether by doing so, Defendants have violated their duty of good faith and fair dealing to the Plaintiff and the Class.  Plaintiff and the Class seek statutory and compensatory damages for the harm caused by Defendants' unlawful conduct, as well as restitution for Defendants' unjust enrichment.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1367.

12.     This Court has personal jurisdiction over defendants because defendants are licensed to do business in Texas or otherwise conduct business in Texas.

13.     This Court also has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA").   Plaintiff is a citizen of the State of Texas and owns a home there.  Defendants are citizens of different states. The amount in controversy in this action exceeds $5,000,000, and there are more than 100 members the classes.

14.     In addition, this Court has diversity jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1332(a). The matter in controversy is greater than $75,000 and this matter is between citizens of different states. This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the real property involved in Plaintiff's mortgage loan transaction is located in this district, Defendants regularly conduct business in this district, and/or a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

16.     Plaintiff Tamara Cochran-May ("Plaintiff") owns a property located at 1016 Seabreeze Drive, Portland, Texas 78374.  On or about December 27, 2001, Cochran-May entered into a mortgage loan agreement with Wells Fargo Home Mortgage, Inc., secured by the property ("Cochran-May Mortgage").  *See* Cochran-May Mortgage, attached as Exhibit 1.

17.     In 2011 and 2012, Plaintiff was charged $4,026.24 for force-placed wind insurance.  On July 15, 2011, Plaintiff's escrow account was also charged $4,026.24 for a "Misc

Ins Payment" to the American Security Group.  *See* Wells Fargo Home Mortgage Quarterly Mortgage Statement dated July 15, 2011, attached as Exhibit 2.

18.    On June 6, 2012, Wells Fargo Home Mortgage sent Plaintiff a Wind Insurance Coverage Notice of Temporary Insurance stating that she had failed to maintain sufficient wind or hail insurance coverage.  *See* June 6, 2012, Wells Fargo Home Mortgage Wind Insurance Coverage Notice of Temporary Insurance ("2012 Temporary Policy") attached as Exhibit 3.  The notice stated:

> . . . WELLS FARGO BANK, N.A. #591 has secured temporary Comprehensive Wind insurance coverage for the above captioned property in the form of a sixty day lapse notice through VOYAGER INDEMNITY INSURANCE COMPANY. This lapse notice cannot be renewed. It covers your house from the perils of windstorm and hail only, including damage from hurricanes, tornados or named tropical storms, up to the dollar limits shown on your lapse notice. It does not protect your personal property nor does it provide any liability insurance coverage.

*Id.*  The 2012 Temporary policy which was placed on the property through Voyager Indemnity Insurance Company in June 2012 provided coverage for the period December 30, 2011 through February 28, 2012, even though there was no damage to the property or claims arising out of the property for the period.  The policy provided $192,000.00 of coverage and had an annual premium of $4,026.24.  The unpaid principal balance at the time was $51,644.25.  The annual premium was charged to Plaintiff's escrow account on July 12, 2012 as a payment to the American Security Group for a "Misc Ins Payment." *See* Wells Fargo Home Mortgage Quarterly Mortgage Statement dated July 15, 2012, attached as Exhibit 4.

## DEFENDANTS

19.    Defendant, Wells Fargo Bank, N.A. is a national bank registered to do business in the State of Texas with its principal address in Sioux Falls, South Dakota.

20.     Defendant Wells Fargo Bank, N.A. sometimes does business under the name Wells Fargo Home Mortgage, Inc. . WFHM services mortgage loans originated and purchased by WFBNA, including mortgage loans and lines of credit to Texas homeowners and homeowners across the United States. At all relevant times, WFHM's conduct was approved, authorized, and/or ratified by WFBNA. WFHM is a California corporation and is headquartered in Des Moines, Iowa.

21.     Defendant Assurant, Inc., a Delaware corporation, "is a provider of specialized insurance products and related services in North America and select worldwide markets." Assurant, Inc. has four operating segments-Assurant Solutions, Assurant Specialty Property, Assurant Health, and Assurant Employee Benefits.

22.     Assurant, Inc., along with QBE Insurance, controls about 90% of the force-placed insurance market. *See* Mary Williams Walsh, New York Investigates Insurer Payments to BankNew York Times (May 21, 2012), attached hereto as Exhibit 5.   Assurant, Inc. offers its force placed ("lender-placed") insurance products through the Assurant Specialty Property segment. "The largest product line within Assurant Specialty Property is homeowners insurance, consisting principally of fire and dwelling hazard insurance offered through [Assurant's] our lender-placed programs." See Assurant Form 10K for the year ending December 31, 2011 at 5 attached as Exhibit 6.   Assurant, Inc. uses "a proprietary insurance tracking administration system linked with the administrative systems of our clients to continuously monitor the clients' mortgage portfolios to verify the existence of insurance on each mortgaged property and identify those that are uninsured" and when a lapse is confirmed "a lender-placed policy is procured by the lender." *Id*.

23.     Defendant Voyager Indemnity Insurance Company ("Voyager"), a company that issues force-placed windstorm insurance policies for Defendants is a wholly-owned subsidiary of Assurant, Inc. ("Assurant"). *See* Assurant, Inc., Annual Report (Form 10-K), Exhibit 21 (February 23, 2011) attached as Exhibit 7.  Plaintiff's force-placed wind insurance policy was issued by Voyager.

24.     Defendant American Security Insurance Company is a Delaware corporation with its principal place of business in Atlanta, Georgia and is a subsidiary of Assurant, Inc. that does business throughout the United States. *Id.*  ASIC provides services to Wells Fargo "to track borrower compliance with insurance obligations and to place lender-placed insurance for Wells Fargo" pursuant to a Master Services Agreement between ASIC, another subsidiary of Assurant, Inc. (Standard Guaranty Insurance Company and WFHM). *See* Declaration of Ronald Wilson, dated January 26,2012, attached hereto as Exhibit 8 (exhibits omitted), available at *Kunzelman v. Wells Fargo*,  Docket No. 11-cv-81373 (S.D. Fla.).  The premium for Plaintiff's force-placed insurance policy was paid to American Security Insurance Company.

## FACTUAL ALLEGATIONS

25.     Defendants WFBNA and WFHM originate mortgage loans and acquire loans from other lenders. Each such loan is secured by a deed of trust on the underlying property. WFHM acts as the servicer of these loans.

26.     Wind insurance, also known as windstorm insurance, protects property owners from losses caused by damaging winds and hail, typically produced by hurricanes or tornadoes. This type of coverage, which is not included in most homeowners' insurance policies, is often required in geographical areas that experience frequent hurricanes or other strong windstorms. Wind insurance policies can cover both the real property, as well as the insured's personal possessions inside the dwelling.

27.     In order to protect the mortgagee's interest in the secured property, mortgage loan contracts typically allow the lender or third party servicer to "force-place insurance" when the homeowner fails to maintain hazard insurance, and in certain geographical areas, a separate wind insurance policy. This discretion afforded Defendants to force place insurance is limited by the bounds of reasonable conduct. The amounts disbursed for the procurement of such insurance will become additional debt secured by the mortgage.  Plaintiff's mortgage loan contracts contain such a provision.  *See* Exhibit 1 ¶ 5.  Thus, the failure of a borrower to maintain wind insurance is clearly contemplated by the mortgage contract and such a failure by the borrower does not result in a material failure to perform under the mortgage contract.

28.     The discretion afforded to WFHM to force-place insurance is, however, limited by the bounds of reasonable conduct and by the express terms of the mortgage itself. WFHMroutinely exceed the bounds of reasonableness and the spirit, intent and letter of the mortgage contract by force-placing insurance in a manner and in amounts that are not required to protect the lender's interest in the property as well as through other conduct described herein with respect to the force-placement of insurance.

29.     The mortgage contract does not disclose that Wells Fargo will force-place borrowers hazard and/or wind insurance with Assurant, a provider with whom it has an exclusive arrangement and with whom it has undisclosed, lucrative arrangements to place borrowers in exorbitantly priced insurance which include kickbacks, unearned commissions, rebates and other consideration.

30.     The mortgage contract does not disclose, however, that WFBNA and WFHM will receive kickbacks, commissions and/or re-insurance premiums from force-placed insurance providers for placing the insurance with them. The mortgage contract also does not disclose that

these payments to WFBNA and WFHM will be based upon percentages applied to the cost of the insurance premium of the force-placed insurance and that the greater the cost to the borrower the greater the payments to WFBNA and WFHM.  Instead, the contracts misrepresent to borrowers that the cost of the force-placed insurance is necessary in order to protect the lender's interest in the secured property.

31.     Borrowers are generally unaware that the force-placed policy often does not cover personal property, nor does it provide any liability insurance coverage.

32.     These lender-placed or "force-placed" insurance policies are always more expensive than market-driven insurance coverage and generally provide less coverage because most forced placed insurance policies do not provide coverage for the contents of the property, liability or loss of use.  Reportedly, such policies can cost as much as ten times more than competitively priced policies. While the force-placed insurance policy is for the benefit of the lender, the entire cost is passed on to the borrower.  *See* Ties to Insurers.

33.     Recently, the force-placed insurance practices of lenders, servicers and insurance companies have, in fact, come under increased scrutiny.  The New York Department of Financial Services recently opened an investigation into the force-placed insurance industry. Superintendent Benjamin N. Lawsky noted that the Department's initial inquiry uncovered "serious concerns and red flags" which included: (1) exponentially higher premiums for force-placed insurance than regular homeowners insurance; (2) extraordinarily low loss ratios; (3) harm to distressed borrowers; (4) lack of competition in the market; (5) force-placed insurance has become a major profit center for both banks and insurers; and (6) "tight relationships between banks, their subsidiaries and insurers."  As Superintendent Lawsky summarized the net result of these practices:

Take the form of large commissions being paid by insurers to the banks for what appears to be very little.  In other cases, banks have set up reinsurance subsidiaries who take over the risk from the insurance companies.  Thus, the banks pay high premiums for coverage that is highly profitable and then those profits revert right back to the banks through reinsurance agreements.

\*      \*      \*

In sum, when you combine [the] close and intricate web of relationships between banks and insurance companies on the one hand, with high premiums, low loss ratios and lack of competition on the other hand, it raises serious issues and questions . . . .

*Force Placed Insurance Hearings: New York Department of Financial Services* (May 17, 2012) (Opening Remarks of Benjamin M. Lawsky, Superintendent of Financial Services); *see also Under Interrogation,* American Banker (Jan. 27, 2012), available at http://www.americanbanker.com/news/force-placed-insurance-subpoenas-1046159-1.html; *Flurry of Subpoenas Raises Force-Placed Stakes*, American Banker (Jan 27, 2012), http://www.americanbanker.com/issues/177_19/force-placed-insurance-subpoenas-probe-1046157-1.html; Gretchen Morgenson, *Hazard Insurance With Its Own Perils,* N.Y. Times (Jan. 21, 2012), available at http://www.nytimes.com/2012/01/22/business/hazard-insurance-with-its-own-perils-fair-game.html.

34.     The New York Department of Financial Services conducted hearings in furtherance of its investigation on May 17, 18 and 21, 2012 during which fact-finding regarding the force-placed insurance practices of Assurant and its lender partners were among the topics addressed by witnesses and in written testimony.  *See, e.g.*, *New York Department of Financial Services: April 12, 2012 Notice of Public Hearings, issued pursuant to N.Y. Financial Services Law §§ 305 and 306 and the Department's Request for Written Testimony Pursuant to N.Y. Insurance Law § 308* (testimony of John Frobose, President, American Security Insurance Company) http://www.dfs.ny.gov/insurance/hearing/fp_052012_testimony.htm ("ASIC NYDFS

Testimony"); *New York State Department of Financial Services, Financial Frauds & Consumer Protection Division, Public Hearing on Lender Placed Insurance* (May 3, 2012) (testimony of Birny Birnbaum on behalf of the Center for Economic Justice) http://www.dfs.ny.gov/insurance/hearing/fp_052012_testimony.htm ("Birnbaum NYDFS Testimony"); and *New York Department of Financial Services on Force-Placed Insurance in New York* (May 17, 2012) (testimony of J. Robert Hunter, Consumer Federation of America) http://www.dfs.ny.gov/insurance/hearing/fp_052012_testimony.htm ("Hunter NYDFS Testimony"); *see also* Assurant Form 10-K for the year ending December 31, 2011, filed on February 23, 2012, at F-83 (noting that "on February 7, 2012, the company and two of its insurance subsidiaries (American Security Insurance Company and American Bankers Insurance Company of Florida) received subpoenas from the New York Department of Financial Services (the NYDFS) regarding its lender-placed insurance business and related document retention practices.").

**<u>Defendants Receive Kickbacks in Violation of Their Duties to Borrowers</u>**

35.     The force-placing of insurance policies is a very lucrative business for servicers. Mortgage servicers, including Wells Fargo, routinely receive kickbacks and commissions from insurance companies for placing borrowers into force-placed insurance.. The mortgage servicer benefits by placing the policy either: (a) with an affiliate or (b) with a third party provider who has already agreed to share revenue with the servicer in the form a direct commission payment and/or through "reinsurance" premiums ceded to a subsidiary/affiliate of the servicer (a "captive reinsurance arrangement").

36.     Under the direct payment or commission arrangement, the provider of the force-placed insurance policy pays a commission either directly to the servicer or to a subsidiary posing as an insurance "agent."  Typically, under such an arrangement, commissions are paid to

a "licensed insurance agency," that is simply an affiliate or subsidiary of the servicer that does no insurance business and exists solely to receive kickbacks or commissions from force-placed insurance providers. Wells Fargo's affiliate, Wells Fargo Insurance, Inc., serves in this capacity in connection with Wells Fargo's force-placed insurance practices and arrangements with Assurant. More particularly, upon information and belief, Wells Fargo collects "commissions" for the policies force-placed with Voyager and/or other Assurant, Inc. affiliates via payments made to Wells Fargo Insurance, Inc.

37.    Under the captive reinsurance arrangement, the provider of the force-placed insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or "captive reinsurer," of the referring mortgage servicer. In return for the subsidiary purportedly agreeing to assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a portion of the premiums received on account of the policy. For example, Assurant – the nation's largest provider of force-placed insurance - has admitted that its force-placed insurance division "writes[s] business produced by clients, such as mortgage lenders and servicers and financial institutions, and reinsures all or a portion of such business to insurance subsidiaries of the clients." *See* Exhibit 6 at F-39.

38.    Illustrative of the arrangements is the following graphic from *American Banker:*

## Sharing in the Profits

How servicers make money arranging force-placed coverage

### Commissions



To replace lapsed homeowners coverage, the servicer, working through a subsidiary, buys policy from insurer

Servicer advances premiums to insurer



Insurer pays portion of premium back to subsidiary as a commission

Servicer bills borrower for the policy



If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale

### Reinsurance

To replace lapsed coverage, servicer buys policy on home from insurer

Servicer advances premiums to insurer

Subsidiary of servicer reinsures part of the policy, gets a cut of premiums

If necessary, subsidiary buys letter of credit from another party

Servicer bills borrower for the policy

If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale

39.     J. Robert Hunter of the Consumer Federation described these practices in his testimony before the New York Financial Services Department in connection with the Department's inquiry into force-placed insurance practices:

> In some instances, lenders use [force-placed] insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or broker or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using "fronting" primary insurers to direct the coverage to lender-affiliated captive reinsurers. Lenders often receive free or below cost service from affiliated service providers.

*See* Hunter NYDFS Testimony.

40.     Indeed, as Birny Birnbaum of the Center for Economic Justice, another experienced and noted expert in the area of force-placed insurance stated:

> Servicers have financial incentives to force-place the insurance because the premiums include commissions and other considerations for the servicer. With some servicers, the insurance is reinsured through captive reinsurer of the servicer, resulting in additional revenue to the servicer from the force-placement coverage.

*See Birnbaum NYDFS Testimony.*

41. Borrowers have no opportunity to comparison-shop for force-placed insurance policies. The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the servicer and the insurer, rather than negotiated between the borrower and the insurer.

42. For their part, servicers have no incentive to seek the best rate. Rather, servicers are financially motivated to force borrowers to the insurer that will provide the greatest financial benefit to the servicer in terms of commission and/or reinsurance premiums. Rather, servicers are financially motivated to refer borrowers to the provider that will provide the best financial benefit to the servicer in terms of commission and/or ceded reinsurance premiums. Because the servicer's "commission" and/or reinsurance premium is usually related to the size of the policy, the servicer actually has an incentive to purchase the *highest* price insurance, an interest diametrically opposed to that of the borrower. *See, e.g.*, Birnbaum NYDFS Testimony; Hunter NYDFS Testimony.

43. Commonly, a mortgage loan servicer enters into an agreement with a provider, pursuant to which it refers borrowers exclusively to the provider for force-placed insurance. For example, in its public filings, Assurant-the nation's largest provider of force-placed insurance policies and the parent of Voyager Indemnity-states that it establishes "long-term relationships" with leading lenders and servicers and that the majority of its lender-placed agreements are

exclusive.  *See* Exhibit 6 at 6 ("The majority of our lender-placed agreements are exclusive."). Defendants have maintained an exclusive arrangement with Assurant since at least 2009.

44.     Upon information and belief, Wells Fargo is party to an agreement with ASIC pursuant to which it receives payments for the referral of business through one or more of the arrangements described above, including through commissions paid to Wells Fargo Insurance, Inc.

45.     Force-placed insurance policies are not underwritten on an individual policy basis. Rather, upon information and belief, servicers' contracts with force-placed insurance providers require or at least permit the insurer automatically to issue these policies when a borrower's insurance coverage is not maintained.

46.     As J. Robert Hunter in his recent testimony before the New York Financial Services Department argued, "lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance."  *See* Hunter NYFSD Testimony.

47.     Servicers often go so far as to actually outsource their insurance processing to the force-placed insurance provider.  The provider then continuously monitors the servicer's mortgage portfolio and verifies the existence of insurance on each mortgaged property. In the event that borrowers do not maintain adequate insurance coverage, the insurer promptly issues an insurance certificate on the property on behalf and for the benefit of the servicer. Thus, where these mortgage servicers receive commissions from force-placed insurance providers (which are ultimately charged to borrowers), they are performing no service for the commissions they receive other than simply providing the referral.

48.     John Frobose, President of American Security Insurance Company confirmed this practice, acknowledging that, "ASIC monitors policy status for possible lapses in coverage, such as when a homeowner's standard policy has been cancelled or is about to expire."  *See* ASIC NYDFS Testimony.

49.     Mortgage servicers profit greatly from the business of force-placed insurance. According to recent article published by *American Banker,* "a cursory review of force-placed insurers' financials suggests that the business brings servicers hundreds of millions of dollars every year."

50.     While servicers profit greatly from their business of force-placing insurance, upon information and belief, they maintain a shroud of secrecy and do not separately report their income from payments received from providers of force-placed insurance.  However, according to a recent article published by *American Banker*, "a cursory review of force-placed insurers' financials suggests that the business bring servicers hundreds of millions of dollars every year." *See* Ties to Insurers, *supra* (noting that servicers demand generous commissions and other payments in return for their referrals).

51.     "The incentives and potential for abuse in the administration of LPI [lender-placed insurance] are great.  Consumers do not request the insurance, but are forced to pay for it. The cost of LPI is much higher than a policy the borrower would purchase on his or her own. Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases, the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the lender from the force-placement of the coverage." *See* July 28, 2011 Testimony of Birny Birnbaum, Executive Director of the Center for Economic

17

Justice, Before the U.S. House of Representatives Subcommittee on Insurance, Housing and Community Opportunity Committee on Financial Services.

52.     In addition, "[t]he prices for residential property LPI are significantly excessive. In 2009, insurers paid only 16% of net premium in claims and in 2010 the ratio was 17%. Incredibly, lenders get a commission—totaling hundreds of millions of dollars—out of these premiums, despite the fact that the insurance is placed to protect the lenders' collateral.  The premiums also include the costs of tracking all the loans in the lenders' portfolios to identify those loans without insurance—so the lenders' cost of tracking all loans is passed only to those consumers paying for force-place [sic] insurance."  *Id.*

53.     Servicers commonly attempt to justify the high price of force-placed insurance policies by pointing to the higher risk associated with the lack of individual policy underwriting. However, as *American Banker* noted:

> Though part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry—even after accounting for the generous commissions and other payments that servicers demand.

*See* Ties to Insurers, *supra*.

54.     Servicers also attempt to blame the exorbitant cost of force-placed insurance on the fact that the policy is issued without the benefit of a prior inspection of the property. However, according to the National Consumer Law Center, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting when the policy is not force-placed, either.  *See id*.

55.     As Birny Birnbaum of the Center for Economic Justice testified, servicer explanations for the high cost of force-placed insurance are "unsupported by any evidence." Loss ratios have been historically low.  *See* Birnbaum NYDFS Testimony.

**Borrowers are Forced to Purchase and Maintain Hazard and/or Wind Insurance for Their Property That is Unnecessary, Duplicative and/or in Amounts Greater than Required by Law or Their Mortgage Agreements.**

56.      Unnecessary or inappropriately priced wind insurance arises when a servicer forces borrowers to purchase and maintain wind insurance for their property that is unnecessary, duplicative and/or in amounts greater than required by law or their mortgage agreements.

57.      Motivated by the lucrative financial incentive associated with force-placing insurance, upon information and belief, Defendants have commonly required borrowers to pay for unnecessary insurance coverage. Such examples include, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds the amount necessary to protect the mortgagee's interest in the secured property; (b) backdating force-placed insurance policies, thus requiring borrowers to pay for retroactive coverage despite the fact that the time has lapsed and no risk of loss exists for such period; and (c) requiring borrowers to pay for force-placed insurance policies despite the existence of a Lender's Loss Payable Endorsement that already protects the lender's interest in the property.

58.      Simply put, force-placed wind insurance policies should not be backdated. The National Associate of Insurance Commissioners ("NAIC") has indicated that insurance is "Prospective in nature." Requiring borrowers to pay for backdated insurance coverage to cover time periods during which there is no risk of loss is improper. *See, e.g.*, Ties to Insurers, *supra* (quoting the NAIC as stating that insurance policies "should not be back-dated to collect premiums for a time period that has already passed").

59.      Moreover, many wind insurance policies contain a Lender's Loss Payable Endorsement. This endorsement typically protects the lender for a period of at least ten days after the termination of the insurance policy. Accordingly, force-placing insurance policies effective immediately following the termination of the borrower's policy and charging borrowers

expensive premiums for such insurance is unlawful and unfair because borrowers are charged for needless and duplicative insurance coverage.

**Government Response**

60.     Force-placed insurance practices of mortgage lenders and servicers, insurance providers and insurance producers are currently the subject of a number of government investigations prompted by concerns that consumers are being gouged when they are force-placed in insurance following a lapse in their policies.  *See Under Interrogation*, *supra*; Gretchen Morgenson, *Hazard Insurance With Its Own Perils*, *supra*; *see also* Louise Story, *Big Banks Face Inquiry Over Home Insurance*, New York Times (Jan. 10, 2012).

61.     Thus, state attorneys general are cognizant of and have taken action concerning servicers' abusive practices concerning force-placed insurance.  Recently, a coalition of forty-nine (49) state attorneys general entered into an historic joint state-federal settlement agreement with the country's five largest loan servicers, including Wells Fargo ("National Mortgage Settlement") to address numerous problems that have surfaced during the foreclosure crisis.  *See* www.nationalmortgagesettlement.com/ (official website established by the government relating to the settlement);  *see also* Jeff Horowitz, *Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies*, American  Banker  (Mar.  10,  2011,  12:25  PM), http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-034213-1.html.

62.     Among other terms, the settlement essentially prohibits servicers from profiting from force-placed insurance.  Specifically, under the settlement, mortgage servicers: (a) shall not obtain force-placed insurance unless there is a reasonable basis to believe the borrower has not paid for property insurance; (b) cannot force-place insurance that is in excess of the replacement cost of the improvements on the secured property; (c) must work with the borrower to continue or reestablish the existing homeowner's policy; (d) shall continue to make payments if there is a

lapse in payment and the payments are escrowed regardless of homeowner payment; and (e) must purchase the force-placed insurance at a commercially reasonable price. *Id.*; *see also Consent Judgment, United States of America v. Bank of America Corp.*, Civ. No. 1:12-cv-00361-RMC (D.D.C Apr. 14, 2012) (ECF No. 14 Section VII).

63.     Fannie Mae has changed its polices so as to curb bank and servicers' improper practices.  It issued a Service Guide Announcement on March 14, 2012 "amending and clarifying its policies regarding the use, coverage, requirements, deductibles, carrier eligibility requirements and allowable expenses for lender-placed insurance" for servicers of the loans it holds.  *See* Fannie Mae Servicing Guide Announcement SVC-2012-04.  The Fannie Mae guidelines seek to eliminate the abuses prevalent in the force-placed insurance industry including requiring that the cost of force-placed insurance be "competitively priced" and "commercially reasonable" and must exclude:

- any lender-placed insurance commission earned on that policy by the servicer or any related entity;

- costs associated with insurance tracking or administration, or;

- any other costs beyond the actual cost of the lender-placed insurance policy premium.

*Id.* at 4.

64.     The New York State Department of Financial Services' recent hearings on force-placed insurance practices have resulted in government action and findings that borrowers were overcharged for force-placed insurance.  On June 12, 2012, Governor Cuomo's official website announced, "DFS Investigation Indicates Insurance Companies Overcharged for Force-Placed Insurance."  Available at http://www.governor.ny.gov/press/06122012DFS.  It stated:

> The evidence of higher than necessary insurance premiums was
> made clear at a recent DFS hearing.  Also, the DFS discovered that
> the force-placed insurance market lacks the sort of completion that

would keep premiums down.  In New York, tow companies have 90% of the market.  In addition, the hearings made clear that force placed insurance costs are having a terrible impact on homeowners, while banks and insurers are profiting off the payments.

*Id.*

65.     The relatively low level of losses associated with force-placed insurance indicates that reinsurance with captives is likely unnecessary.  For example, during 2009, Assurant collected approximately $2.7 billion of premiums through its Specialty Insurance Division, which is overwhelmingly devoted to force-placed insurance.  Notably, this insurer paid out only 36% of this amount in claims—though in the company's other lines of business, a 70% claims-to-premiums ratio is the norm.  Not surprisingly, far from being an excessive risk, force-placed insurance is actually this insurer's most profitable product.  *Id.*  Birny Birnbaum, in his testimony before the New York Attorney General, presented statistics collected by the NAIC reflecting nationwide loss ratios for LPI hazard insurance during the 2004-2011 period as being, on average, more than thirty-five points higher than the ratios for commercially available homeowners policies.  *See* Birnbaum NYDFS Testimony at 9.  When confined to the period from 2007-2011, the disparity between LPI hazard insurance loss ratios and those of commercially available homeowners policies was nearly 42 points.  *Id.*

66.     Plaintiffs contend that the same is true with respect to captive reinsurance arrangements relating to force-placed insurance.  Defendants, however, failed to provide adequate disclosure and, further, failed to provide borrowers with any opportunity to opt out of having his/her force-placed insurance policy provided by an insurer with whom Defendants had a captive reinsurance arrangement.

22

**Defendants' Practices Artificially Inflate Premiums For Force-Placed Insurance**

67.     As American Banker observed, "[w]hile servicers that partner with force-placed insurers customarily perform little of the work in monitoring their portfolios for lapses and writing policies, payments to them are simply a cost of doing force-placed business." *See* Ties to Insurers, *supra*.  These costs are ultimately paid by the borrowers.

68.     Notably, Assurant, Inc.'s public filings indicate that approximately 40% of its force-placed insurance division's revenue is allocated to pay for "general expenses."  This category includes commissions/referral fees paid to lenders.   In other lines of insurance, overhead and expenses are usually a much smaller fraction of policyholder claims.  *See* Assurant Form 10-K for the year ending December 31, 2011, filed on February 23, 2012, at 61.  Indeed, industry analysts have opined that referral fees, commissions and other payments to bank affiliates explain why insurers' overhead, which is ultimately passed on to borrowers, is higher— implying paydays for servicers amounting to hundreds of millions of dollars per year.  *See, e.g.,* Birnbaum NYDFS Testimony.

69.     Moreover, premiums are inflated because they include tracking servicing costs and expenses on top of the cost of the force-placed insurance itself, including loan tracking and servicing activities.  *Id.*

70.     The premiums are also inflated by the payment of kickbacks to servicer affiliated insurance producers, such as Wells Fargo Insurance Services as these producers do not perform the activities typically associated with insurance producers and brokers, which justify a commission:

> The classic role of the insurance producer is to help the policyholder determine her insurance needs and shop the market for the insurance product that meets the policy holder's needs while seeking the most competitive prices for the product.  Such activities simply do not exist in [FPI] because there are only two

national providers of the necessary package of insurance and related services and there is no price competition among the insurers. Soliciting new business consists of asking typically two venders for proposals—and such activity is a rare event for most servicers.

*Id.*

71.     Defendants' practices of unlawfully profiting from the force-placement of insurance policies tend to keep premiums for force-placed insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks. Amounts paid to servicers and their affiliates as commissions and reinsurance premiums have become a part of the cost of doing business for force-placed insurance providers. As a result, force-placed insurance premiums incorporate the payment of such kickbacks—to the detriment of consumers.

72.     Defendants' conduct has threatened and, indeed, stifled competition. As the NAIC recently opined when asked whether pricing in the force-placed insurance industry is competitive, servicers have "no incentive to select a competitively priced product, but instead would be more concerned with selecting one they know best protects the bank's interests or one where they are provided with an incentive or inducement to enter into the transaction." *See* Ties to Insurers, *supra.*

73.     Indeed, industry analysts have opined that referral fees, commissions and other payments to bank affiliates explain why insurers' overhead, which is ultimately passed on to borrowers, is higher – implying paydays for servicers amounting to hundreds of millions of dollars per year. *Id.*

## CLASS ACTION ALLEGATIONS

74.     Plaintiff brings this action pursuant to Rule 23 Federal Rules of Civil Procedure on behalf of the following proposed classes:

24

THE CLASS:

All persons in the United States, who have or had a residential mortgage loan or line of credit serviced by Wells Fargo Bank, N.A. or Wells Fargo Home Mortgage, Inc. where wind insurance was force-placed upon the secured property at any time between July 12, 2009 and the date of final judgment in this lawsuit.

THE TEXAS SUBCLASS:

All members of the Class whose secured property was located in Texas.

75.     The Class excludes persons who have Florida properties included in the class certified in *Williams et al. v. Wells Fargo, N.A. et al.*, Case No. 11-21233 (S.D.Fla.), Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns and the Judge or Magistrate Judge to whom the case is assigned, as well as the Judge's immediate family members.[2]

76.     The Class is so numerous that joinder of all members is impracticable.

77.     A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

78.     Plaintiff's claims are typical of the claims of the Class.

79.     There are questions of law and fact common to the Class, including but not limited to:

      (a)     Whether Defendants had captive reinsurance arrangements with force-placed insurance providers;

---

[2]     The class that was certified in *Williams* is defined as: All borrowers that had mortgages with and/or serviced by Wells Fargo Bank, on property located within the State of Florida, that were charged, and who either paid or who still owe, premiums for a force-placed insurance policy within the applicable statute of limitations through April 7, 2011 ("the Class Period"), unless (1) the lender has obtained a foreclosure judgment against the borrower; (2) the borrower has entered into a short-sale agreement with the lender; (3) the borrower has granted a deed in lieu of foreclosure to the lender; (4) the borrower has entered into a loan modification agreement with the lender; (5) the borrower has filed a claim for damages which has been paid in full or part by the force-placed insurer; or, (6) the cost of force-placed insurance was canceled out in full.

(b)     Whether Defendants maintained a policy of referring force-placed insurance business to insurers pursuant to pre-arranged agreements

(c)     Whether Defendants received commission payments from force-placed insurance providers;

(d)     Whether subsidiaries or affiliates of Defendants received reinsurance premium payments from force-placed insurance providers;

(e)     Whether Defendants' force-placed insurance policies were provided by an affiliated entity;

(f)     Whether Defendants or their affiliates participated in arrangements that involved kickbacks;

(g)     Whether Defendants received financial benefits from the force-placed insurance provider in the form of insurance monitoring, tracking and processing services;

(h)     Whether Defendants received unauthorized and illicit payments in connection with force-placed insurance that were unrelated to a *bona fide* service in connection with the force-placed insurance and its purpose;

(i)     Whether Defendants received payments in connection with force-placed insurance that exceeded the value of any services actually performed or that were otherwise commercially unreasonable;

(j)     Whether Defendants wrongfully backdated forced-placed insurance policies;

(k)     Whether Defendants required unnecessary or duplicative force-placed insurance;

(l)     Whether Wells Fargo breached its fiduciary duty to Plaintiffs and members of the Class;

(m)     Whether Assurant, Inc., ASIC and Voyager induced and/or participated in Wells Fargo's breach of fiduciary duties

(n)     Whether Defendants' conduct constituted an unfair business practice;

(o)     Whether Defendants breached the terms of Plaintiffs' and Class members' mortgages or loan contracts;

(p)     Whether Defendants violated their implied covenant of good faith and fair dealing;

(q)     Whether Defendants' conduct was unconscionable;

(r)     Whether Defendants have been unjustly enriched;

(s)     Whether Defendants are liable to Plaintiffs and the Class for damages and, if so, the measure of such damages; and

(t)     Whether Defendants' conduct was knowing for purposes of application of the Texas Deceptive Trade Practices – Consumer Protection Act.

80.     These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

81.     The same common issues predominate with respect to all Class members, regardless of whether their loans were originated by or merely serviced by Defendants.

82.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have no claims antagonistic to those of the Class. Plaintiffs have retained counsel competent and experienced in complex class actions, including all aspects of litigation. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

83.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants.

84.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

85.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making

appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

86.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT ONE
### UNJUST ENRICHMENT AND DISGORGEMENT

87.     Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

88.     Plaintiff and the members of the Class have conferred a substantial benefit upon Defendants which has been appreciated by Defendants. During the Class Period, Defendants have wrongfully collected millions of dollars in purported commission payments and reinsurance premiums and derived from the force-placed wind insurance premiums paid by Plaintiff and the putative Class members.

89.     These payments were accepted and retained by Defendants under circumstances such that it would be inequitable for Defendants to retain the benefit without payment to Plaintiff and the members of the Class.

90.     As a result of Defendants' unjust enrichment, Plaintiff and the respective Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

91.     Further, Plaintiff and the Class, individually and on behalf of the public, seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

92.     Defendants received from Plaintiffs and Class Members a benefit in the form of overcharges for force-placed insurance policies which are excessive and unreasonable, and are the result of overreaching and self-dealing.

93.     Defendants entered into an agreement where American Security would provide force-placed insurance policies to Plaintiffs and the Class which were paid for at prices that were far higher than the market rates for similar policies.  Defendants knew that the charges for these policies were excessive and not the result of good faith practices.

94.     American Security paid significant monies in illegal kickbacks, commissions, and referral fees directly to Defendants in order to be able to exclusively provide force-placed insurance policies at unreasonable rates.

95.     As a result, Plaintiffs and the Class have conferred a benefit on Defendants, and Defendants have knowledge of this benefit and have voluntarily accepted and retained the benefit conferred on them.

96.     Defendants will be unjustly enriched if they are allowed to retain the benefit, and each Class member is entitled to an amount equal to the amount each Class member enriched Defendants and for which Defendants have been unjustly enriched.

**COUNT TWO**

**BREACH OF CONTRACT**
**(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**

97.     Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

29

98.     Every contract contains an implied covenant of good faith and fair dealing.

99.     The mortgage contracts of Plaintiff and the other Class members contained an implied covenant of good faith and fair dealing, pursuant to which Defendants were bound to perform their obligations in good faith and to deal fairly with Plaintiff and the other Class members.

100.    To the extent that the mortgage contracts of Plaintiff and the Class members permitted Defendants unilaterally to "force-place" insurance, Defendants were obligated not to exercise their discretion capriciously, in bad faith, and for their own financial gain.

101.    Defendants breached their duties of good faith and fair dealing in at least the following respects, among others:

> (a)   Failing to make any effort whatsoever to maintain borrowers' existing insurance policies and, instead-for the sole purpose of maximizing their own profits-forcing borrowers to pay for insurance policies from providers of Defendants' choice. These policies needlessly came with substantially greater premiums, while providing less coverage than borrowers' existing policies;

> (b)   Using their discretion to choose a force-placed insurance provider and policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully forcing borrowers to pay for both (i) the actual cost of protecting the mortgagee's interest in the property and (ii) the cost of the commissions/reinsurance premiums Defendants accepted from the force-placed insurance provider;

> (c)   Failing to seek competitive bids on the open market or otherwise making reasonable good faith efforts to exercise their discretion and instead selecting force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies are continually purchased at excessive costs through the same companies in order to produce additional profits for Defendants;

> (d)   Assessing excessive, unreasonable, and unnecessary insurance policy premiums against Plaintiffs and Class and misrepresenting the reason for the cost of the policies which included amounts not directly related to the provision of force-placed insurance;

(e)     Collecting a percentage of the force-placed premiums charged to Plaintiffs and the Class and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

(f)     Accepting purported reinsurance premiums and/or commissions in return for placing borrowers with force-placed insurance providers, despite the fact that Defendants actually incur little, if any, expense because: (i) the force-placed insurance policies are automatically issued pursuant to pre-arranged agreements with providers; and/or (b) Defendants' captive reinsurance agreements provide for little or no actual transfer of risk;

(g)     Backdating force-placed insurance policies to cover time periods which have already passed and for which there was already absolutely no risk of loss;

(h)     Misrepresenting in their force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time and/or the lender's coverage;

(i)     Procuring force-placed insurance policies to cover time periods during which the mortgagee is already covered; and;

(j)     Failing to provide borrowers with any opportunity whatsoever to opt out of having their force-placed insurance policies provided by an insurer with whom Defendants had a commission and/or captive reinsurance arrangement.

102.    As direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the other Class members have suffered damages.

103.    Plaintiff and the other Class members have been damaged as a direct and proximate result of Defendants' breach and are entitled to damages.

## COUNT THREE

## BREACH OF CONTRACT

104.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

105.    Defendants have serviced loans evidenced by substantially similar standard form notes and mortgage contracts.

106.    To the extent that the mortgage contracts of Plaintiff and the Class permitted

107.    Defendants unilaterally to "force-place" insurance, Defendants were contractually obligated to exercise their discretion to do so in a reasonable manner.

108.    Nonetheless, Defendants have imposed and/or collected amounts that exceeded the amounts necessary to protect the mortgagee's interest in the policy. Such practices have included, without limitation: (a) requiring borrowers to pay amounts for insurance coverage that exceed the amounts necessary to protect the mortgagee's interest in the secured property; (b) backdating force-placed insurance policies, thus requiring borrowers to pay for retroactive coverage despite the fact that the time has lapsed and no loss occurred during the lapsed period; and (c) requiring borrowers to pay for force-placed insurance policies despite the existence of a Lender's Loss Payable Endorsement that already protects the lender's interest in the property.

109.    Defendants have thus breached the mortgage contracts of Plaintiff and the other Class members.

110.    Plaintiff and the other Class members have been damaged as a direct and proximate result of Defendants' breach and are entitled to damages.

<strong>COUNT FOUR</strong>

<strong>BREACH OF FIDUCIARY DUTY/MISAPPROPRIATION<br>OF FUNDS HELD IN TRUST<br>(AGAINST THE WELLS FARGO DEFENDANTS)</strong>

111.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

112.    Wells Fargo holds and/or controls funds in escrow; controls the establishment, funding requirements and maintenance of escrow accounts for the purposes of paying taxes,

32

assessments, insurance premiums and other items set forth in borrowers' mortgages, *see* Exhibit 1 ¶ 3;, and is obligated under the mortgages to return any excess funds in accordance with the terms of the mortgages.

113.   Wells Fargo has required payment of and accepted monies from Plaintiff and Class members Items identified in their mortgage on a monthly basis and held them in escrow. Similarly, since the time that Wells Fargo force-placed Plaintiff and Class Members' wind insurance, it required payment of and accepted monies from Plaintiff and Class members for Escrow Items and charged the cost of the premiums to Plaintiff and Class member's escrow, pursuant to the terms of their mortgages.

114.   Wells Fargo was obliged to hold, manage and control these escrow funds in trust, and owed Plaintiffs and members of the Class the highest fiduciary duty with respect to the handling of such funds.

115.   Wells Fargo breached its fiduciary duty to Plaintiff and the members of the Class by, *inter alia*: (a) unilaterally using escrow funds to purchase force-placed insurance at a cost and in amounts that were inflated solely in order to generate additional profits for Defendants; (b) profiting from unnecessary and excessive force-placed insurance policies that were purchased from escrow funds at the expense of Plaintiff and the Class members; (c) unilaterally utilizing the escrow funds to pay for unnecessary and duplicative insurance for periods for purposes of increasing Defendants' profits; and (d) improperly depleting the escrow funds for unnecessary, unauthorized and duplicative wind insurance resulting in additional costs and injury to Plaintiff and members of the Class.

116.   These actions were undertaken by Wells Fargo in bad faith solely for the benefit of Defendants and were not intended to benefit Plaintiff or other borrowers.

117.    As a direct result of Wells Fargo's actions and subversion of Plaintiff's interest to Defendants' own interests in reaping additional, extravagant and unauthorized fees and profits, Plaintiff and the Class have suffered injuries in the form of unnecessary and excessive escrow charges, unnecessary and improper depletion of escrow funds intended for and properly allocated to other Escrow Items, a loss of funds from their escrow accounts and/or loss of equity in the property due to increases in the amounts due under the mortgage to cover escrow shortfalls.

118.    Plaintiff and the Class are entitled to all damages resulting from Wells Fargo's breach of its fiduciary obligations and misappropriation of escrow funds.  In addition, Plaintiffs and the Class are entitled to punitive damages because Wells Fargo acted in bad faith in deliberate and/or reckless disregard of their rights and Wells Fargo's obligation to hold their escrow funds in trust.

## COUNT FIVE

### AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY (AGAINST DEFENDANTS AMERICAN SECURITY INSURANCE COMPANY, ASSURANT, INC. AND VOYAGER)

119.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

120.    Wells Fargo breached its fiduciary duties to Plaintiffs and the Class as set forth hereinabove, including specifically as set forth in Count Four.

121.    Assurant, Inc., ASIC and Voyager actively induced and/or participated in Wells Fargo's breach of fiduciary duties through the conduct described herein, including, but not limited to, offering Wells Fargo the opportunity to reap additional profits through a scheme to force-place borrowers serviced by Wells Fargo in unnecessary, duplicative and exorbitantly priced force-placed insurance and tracking services sold by ASIC, Voyager and other Assurant,

Inc. subsidiaries, in exchange for kickbacks, sham commissions, fees for sham services and "rebates" paid to Wells Fargo.

122.    Assurant, Inc.,  ASIC and Voyager actively induced and/or participated in Wells Fargo's breach of fiduciary duties through the provision of tracking services that identified and implemented the force-placement of Plaintiff and Class members in unnecessary, duplicative and exorbitantly wind insurance and facilitated the billing and payment for such insurance.

123.    As a result of the breach of fiduciary duties to Plaintiffs and members of the Class by Wells Fargo that Assurant Inc., ASIC and Voyager induced and/or participated in as herein described, Plaintiff and members of the Class suffered damages in the form of unnecessary and excessive escrow charges, unnecessary and improper depletion of escrow funds intended for and properly allocated to other Escrow Items, a loss of funds from their escrow accounts and/or loss of equity in the property due to increases in the amounts due under the mortgage to cover escrow shortfalls.

124.    Plaintiff and the Class are entitled to all damages resulting from Wells Fargo's breach of their fiduciary obligations and misappropriation of escrow funds.  The Assurant defendants are liable for these damages by virtue of Assurant's aiding and abetting Wells Fargo's conduct.

## COUNT SIX

## VIOLATION OF TEXAS' DECEPTIVE TRADE PRACTICES – CONSUMER PROTECTION ACT

125.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

126.    Texas' Deceptive Trade Practices – Consumer Protection Act, 17.41 Tex. Business & Comm. Code., *et seq.* ("Texas DTPA"), prohibits "false, misleading or deceptive

acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. . ." § 17.46(a) Tex. Business & Comm. Code.

127.    Plaintiff is a "consumer" as defined in the Texas DTPA.

128.    Defendants have engaged in, and continue to engage in, unconscionable acts or practices and used unfair or deceptive acts in the conduct of their trade and/or commerce in the State of Texas.

129.    The policies, acts, and practices alleged herein were intended to result and did result in the payment of excessive fees for force-placed wind insurance by the Plaintiff and which in turn were intended to generate unlawful or unfair kickbacks or commission for Defendants.

130.    Defendants' conduct of charging an unreasonable and excessive fee for their force-placed wind insurance to Plaintiff and class members violates the Texas DTPA and are violations of Tex. Business & Comm. Code §17.46(b)(5) and (b)(12).

131.    Plaintiff and the Class members sustained damages as a direct and proximate result of Defendants' unfair and unconscionable practices. Plaintiff and the Class members are entitled to recover their actual damages, plus attorney fees and costs.

132.    Plaintiff and the Class members are entitled to treble damages for knowing violations of the Texas DTPA.

133.    Plaintiff and the class members have suffered and will continue to suffer irreparable harm if Defendants continues to engage in such deceptive, unfair, and unreasonable practices.

134.    Plaintiff and the other Class members have been damaged as a direct and proximate result of Defendants' breach and are entitled to damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A.     Certify this case as a class action, appointing Plaintiff as class representative and counsel as class counsel;

B.     Find that the conduct alleged herein be declared, adjudged and decreed to be unlawful and enjoined from any further violation of law;

C.     Award damages sustained by Plaintiff and the Class as a result of Defendants' breach of the implied covenant of good faith and fair dealing, together with pre-judgment interest;

D.     Award damages sustained by Plaintiff and the Class as a result of Wells Fargo's breach of fiduciary duty and the Assurant defendants aiding and abetting Wells Fargo's breach of fiduciary duty;

E.     Find that Defendants have been unjustly enriched and require Defendants to refund all unjust benefits to Plaintiff and the Class, together with prejudgment interest;

F.     Declare the provision in the mortgage instrument relating to force-placed insurance to be procedurally and substantively unconscionable and require Defendants to refund an amount equal to all hidden profits or other financial benefits collected from Plaintiff and the Class, and to rescind all such amounts charged but not yet collected from Plaintiff and the Class by virtue of the provision;

G.     Award damages, injunctive relief, declaratory relief, treble damages, attorney's fees, and costs under Texas' Deceptive Trade Practices – Consumer Protection Act;

H.     Award Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class's counsel and experts, and reimbursement of expenses;

I.     Grant such other and further relief the Court deems just and equitable.

37

## DEMAND FOR JURY TRIAL

Plaintiff and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.


Dated: _____7/24/2012_____                  Respectfully submitted,

                                               **BURCK, LAPIDUS, JACKSON & CHASE, PC**


                                               ____*/s/ Caldwell Fletcher*_____
                                               Caldwell Fletcher
                                               TBN:  07141710, SDID: 9654
                                               5177 Richmond Ave., Suite 850
                                               Houston, TX  77056
                                               Tel.  (713) 400-6000
                                               Fax  (713) 622-8054
                                               cfletcher@bljc-law.com

                                               Krishna B. Narine (*pro hac vice*)
                                               Joel C. Meredith (*pro hac vice*)
                                               **MEREDITH & NARINE**
                                               1521 Locust Street, 8th floor
                                               Philadelphia, PA  19102
                                               Phone: 215-564-5182
                                               Fax: 215-569-0958
                                               knarine@m-npartners.com
                                               jmeredith@m-npartners.com

                                               Edward W. Ciolko (*pro hac vice*)
                                               Amanda Trask (*pro hac vice*)
                                               Peter H. LeVan, Jr. (*pro hac vice*)
                                               **KESSLER TOPAZ
                                               MELTZER & CHECK, LLP**
                                               280 King of Prussia Road
                                               Radnor, PA  19087
                                               Telephone: (610) 667-7706
                                               Facsimile: (610) 667-7056
                                               eciolko@ktmc.com